**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1-11-cv-01840-REB-MJW

TANYA YOUNG, on her own behalf and
on behalf of others similarly situated,

    Plaintiffs,

v.

DOLLAR TREE STORES, INC.,

    Defendant.

---

**DEFENDANT DOLLAR TREE STORES, INC.'S OPPOSITION TO**
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

---

    Though Plaintiff seeks to certify a class of every current and former Dollar Tree Assistant Store Manager ("ASM") who has worked in Colorado in the last three years (*see* #43), she does not identify a *single other individual* in Colorado with claims similar to hers. She does not offer a single declaration from any ASM who ever worked in Colorado. Indeed, she offers *no evidence whatsoever,* other than her own self-serving declaration (which she largely contradicted in her deposition), in support of her claim that Dollar Tree violated Colorado law on a class-wide basis. Plaintiff acknowledges that she bears the burden of meeting the specific requirements in Federal Rule of Civil Procedure 23, yet she nonetheless proceeds as if such factors can be satisfied based on her allegations alone. The law unequivocally holds otherwise, as made clear in the Supreme Court's recent decision in *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2553 (2011), which explains clearly that a "rigorous analysis" of the evidence is required before certification can be granted. Tellingly, Plaintiff fails to make reference to this seminal Rule 23 case in her motion.

    Clearly, there is no evidence demonstrating Plaintiff's claims are common to the putative class. To the contrary, the class she seeks to certify is one made up of individualized "exceptions to the rule."  It is undisputed that Dollar Tree's policies expressly prohibit working off the clock. Dollar

Tree requires non-exempt employees to be paid for all hours worked, *specifically including* work delivering bank deposits and time worked during meal breaks. Plaintiff claims that *despite these policies*, Colorado ASMs were not paid for time making bank deposits and working during meal breaks. But Plaintiff's own testimony, and a wealth of other evidence, demonstrates that Dollar Tree's policies *usually were followed, and that any off the clock work was the exception, not the rule*. This is confirmed by the declarations of no less than 28 Colorado ASMs ("Dollar Tree's Declarants")[1] and a scientific survey of current and former ASMs in Colorado (and nationwide).

First, there is no common practice of denying ASMs pay for making bank deposits. Plaintiff herself, and most of Plaintiff's Declarants, admitted in deposition that *they were paid for bank deposits*. Second, the evidence demonstrates that there is no common practice of requiring unpaid work during meal breaks. Several of Plaintiff's Declarants admitted that their meal breaks were uninterrupted at several stores. Additionally, the overwhelming majority of Dollar Tree's Declarants *who work in Colorado* testified that their meal breaks were never interrupted or usually uninterrupted; if any were interrupted on occasion during meal breaks, they either were paid for the time or took other break time to make up for the interruption. As with bank deposits, the circumstances surrounding meals are entirely local to the particular store, Store Manager and individual ASM, and these circumstances determine whether an ASM may or may not have been interrupted during a meal break and may or may not have been compensated for any interruption.

There are many other dissimilarities affecting the claims in this case. For example, although Plaintiff seeks payment of overtime for hours worked in excess of 40 hours per week, many of the putative class members worked only part-time, and never worked anywhere close to 40 hours per week. Accordingly, even if they had worked off the clock (which was not the case), they still would not reach 40 hours and would not share in a claim of lost overtime. Similarly, Plaintiff alleges a failure to pay minimum wages, but none of the putative class members is alleged to have had a

---

[1] Not one of the cookie-cutter declarations Plaintiff cites was provided by *any ASM who ever worked in Colorado*.

nominal hourly rate lower than the minimum wage; the claim is that the weekly wage falls below the minimum when zeros for off the clock hours are added.[2] Yet some putative class members were paid an hourly rate so high that even if they had meal periods and bank trips off the clock (which, again, is denied), their hourly wage for the week still would not fall below the minimum wage. Sorting out such differences in the class would require highly individualized inquiries into the numbers of hours actually worked each week and the wage rate paid for those hours each week for each of hundreds of putative class members.

What the evidence does show is that this case is nothing more than the search for localized exceptions to policies prohibiting off the clock work. Plaintiff herself admitted this. Young Tr. 77:7-16.[3] She explained that Dollar Tree policies prohibited off the clock work, but that **sometimes** the policy was not followed:

> Q. . . . you understood that [no working after punching out] to be the policy of Dollar Tree while you worked there, correct? . . . A. Actually, that was the – that was the policy as far as that, but that didn't always happen. Q So **sometimes the policy wasn't followed**? A. **Correct**."

Young Tr. 82:11-23 (emphasis added). She admitted that "timekeeping practices did differ between the stores." Young Tr. 228:2-4. Though Plaintiff claims off the clock work was allowed *in her stores*, the evidence shows it was not in others.

Plaintiff would love to overlook it, but the Supreme Court recently held that such searches for localized exceptions are the opposite of the "common issues" required to certify a Rule 23 class. *See Wal-Mart,* 131 S. Ct. at 2553 (reversing certification in where "Wal-Mart's announced policy forbids sex discrimination" and local factors affected whether policy was followed). Class actions can proceed only where liability depends on a common contention *that can be resolved for all plaintiffs by common proof*. The class must be so similar that litigation will "generate

---

[2] Plaintiff claims a violation of the "Colorado Wage Act," but there is no Colorado law by that name. The statute to which Plaintiff perhaps intended to cite does not even provide for civil actions for recovery by current employees (a large portion of the class Plaintiff seeks to certify). *See* Dollar Tree's Motion to Dismiss Counts III, IV and V of Am. Compl. (#75).

[3] All transcript excerpts are attached as Exhibits 24-38.

common answers [to common questions that are] apt to drive the resolution of the litigation. ***Dissimilarities within the proposed class are what have the potential to impede the generation of common answers***." *Id.* at 2151 (emphasis added).

Here, the dissimilarities are many and fundamental – including everything from "was always paid" to "was never paid" – and are so dependent on local factors such as Store Manager practices and preferences, that there is no way these claims of off the clock work in bank runs and meal breaks can be tried through common proof. *See id.* Those dissimilarities alone are enough to prevent certification, but there are other dispositive reasons too. First, the interests of Plaintiff and putative class members directly conflict. Plaintiff and putative class members are among those alleged to have violated putative class members' rights. It is well-settled that no class can be certified that includes both alleged wrong-doers and alleged victims. This is especially true where the alleged wrong-doers include the named Plaintiff. *See infra* pp. 27-28. Second, Plaintiff lacks standing to represent a class seeking relief for off the clock work during bank deposits, because Plaintiff has not suffered the injury at issue. She testified that she was paid for all or substantially all bank runs. *See infra* I.C.9. For all of these reasons, if there were ever a case where certification clearly was inappropriate, this is it.

I.      **STATEMENT OF FACTS**[4]

A.      **Dollar Tree Stores and Assistant Store Managers**

1.      Dollar Tree is a national retailer with over 4,300 stores in the continental United States, including 70 in Colorado. McDearmon Decl. ¶ 6 (Ex. 1). Dollar Tree stores differ in many ways. Sales volume ranges from $400,000 to $6,300,000 per year. *Id.* ¶ 8. Square footage varies from 1,750 to 33,711. *Id.* Dollar Tree classifies stores as small ("core"), large, super and racetrack. *Id.* ¶ 9. Store layout, staffing, and management practices differ among these store types. *Id.* ¶¶ 8-13.

---

[4] This Statement of Facts serves for this brief and for Dollar Tree's opposition to Plaintiff's motion to certify a nationwide FLSA collective action. Accordingly, this section recites evidence from Colorado and other places. As noted above, relative to this motion to certify a Colorado class, Plaintiff has not submitted any evidence in Colorado besides her own declaration.

The number of associates at a store also varies widely, from a handful to 25 or more. *Id.* ¶ 10.

2.    Each store is managed by a Store Manager, who is assisted by ASMs. The SM and ASMs supervise hourly sales associates. *Id.* ¶ 11. Stores generally have 1 to 4 ASMs, though some stores have as many as 6 ASMs. *Id.* ¶ 10. ASMs are paid by the hour, and are responsible for supervising associates, protecting assets, enforcing policies, resolving payroll issues (including other ASMs' issues), and assisting with store operations. *Id.* ¶ 12; *see also* Young Tr. 54:24–55:5. Depending on the type of store, ASMs may have specialized titles and responsibilities. *Id.* ¶ 13.[5] In some stores, ASMs designated as Freight Managers handle unloading the truck and ordering merchandise, while ASMs designated as Front End Managers tackle cashier and customer issues. This matters here, because, for example, Freight Managers do not make bank deposits in some stores, Donohue Tr. 146:11-15, while in other stores, according to Plaintiff, these titles have no meaning, because "everybody did everything," Young Tr. 20:18-25.

3.    Dollar Tree employs about 12,000 ASMs throughout the United States, including 215 in Colorado (and 570 since July 15, 2008). McDearmon Decl. ¶ 7. In Colorado, 113 currently are full-time and 102 are part-time. 6492 are full-time and 5508 part-time nationwide. *Id.* ¶ 15. Part-time ASMs normally work 34 hours or less each week. *Id.* ¶16. Although part-time ASMs sometimes work more than 34 hours, that is unusual; 71.1% of work weeks in 2011 for Colorado part-time ASMs were less than 35 hours, and the average part-time Colorado ASM worked between 26.6-28.9 hours each week from 2008-2011, including meal breaks. *See* Ex. 2 (Baker Rpt.), ¶ 8, Table 1.

**B.    Timekeeping, Break, and Pay Policies Prohibit Off The Clock Work**

4.    Dollar Tree's policies prohibit off the clock work, specifically including work during meal breaks and bank runs:

- "Associates are not permitted to work off the clock." *See* Ex. 3 (Assoc. Timekeeping

---

[5] *See also* Cook Tr. 291:18-21 (different ASM positions have different responsibilities), 309:17-22; Houston Tr. 53:24-56:11; Combs Tr. 26:19-27:13; Donohue Tr. 57:23-58:10.

Responsibilities). "Associates must clock in and out for time worked; scheduled or unscheduled. ***This includes meals and breaks***." *Id.* (Emphasis added.)

- "Associates must clock in and out during their paid breaks and ***unpaid lunches***. At no time are Associates permitted to perform any work without clocking in." *See* Ex. 4 (2010 Store Assoc. Handbook) p. 35 (emphasis added).

- "Federal Law as well as Dollar Tree's policies require all hourly-paid Associates to be paid in full for all time worked and to maintain accurate records. This includes, but is not limited to, . . ***driving to and from the bank for bank deposits*** . . ." *Id.,* p. 33 (Emphasis added.)

Plaintiff conceded these are the policies. Young Tr. 69:8-70:1. Dollar Tree's policies require that bank deposits be made at least once daily, however, they do not specify whether to use an armored car, which bank to use, or when to make the deposit.

     5.    Dollar Tree's policies require associates, including ASMs, to take one 10-minute paid rest break for every four hours of work and one 30-minute unpaid meal period for every six hours of work (with different meal period thresholds in some states). *See* Ex. 4, p. 34.

     6.    Dollar Tree's policies require associates to use Time Clock Worksheets to report any adjustments to clock-in and clock-out times that are necessary to ensure that time records accurately report all time worked: "All time adjustments must be recorded on the Time Clock Worksheet. All time adjustments require management approval and associate signature." *See* Ex. 5 (ABC's of Scheduling). "Adjustments to any time clock records may not be made without proper verification, including notifying the associate." *See* Ex. 6. (Mgmt. Payroll Approval & Timekeeping Resps.). ASMs and Plaintiff use Time Clock Worksheets for associates and ASMs. Young Tr. 53:16-54:23.

     7.    Dollar Tree's policies provide for disciplinary action against managers who permit off the clock work and associates who work off the clock. *See* Ex. 6. Falsification of time records is prohibited and can result in disciplinary action, up to and including termination. McDearmon Decl. ¶ 31; Ex. 4, p. 33, 35-36. [6] In a scientific survey, 33% of ASMs in Colorado (and 27% nationwide)

---

[6] Plaintiff's Declarant Cook was disciplined for working off the clock during meal breaks, Cook Tr. 217:8-218:2, 240:1-5, and Plaintiff's Declarant Bland was disciplined when he jokingly said he had arranged for off the clock work. Bland Tr. 124:17-125:10, 312:23-313:2.

reported that they had counseled other associates for not accurately or completely recording all hours worked. Ex. 7 (Jay Decl, Ex. A, p 40; Ex. B, p. 39.)

8.    Dollar Tree's policies are posted on Dollar Tree's internal website, in employee break rooms and the manager's office, and on the cash registers[7] where ASMs clock in and out.[8] McDearmon Decl. ¶¶ 17-19. ASMs are trained on these policies,[9] and Plaintiff's Declarants were aware of them.[10] 94% of Colorado ASMs and 93% of ASMs nationwide reported that they were required to accurately record all hours worked. Ex. 7. (Jay Decl. Ex. A, p. 39; Ex. B, p. 38).

### C.    Dollar Tree's Local Bank Deposit Practices Vary

9.    Plaintiff testified that virtually every time she made a bank run, she was paid for all of that time.[11] The only times she was not fully paid were a few instances when she was paid for 10 minutes but the run took a "couple minutes" longer and she did not ask for the "couple" minutes. Young Tr. 86:15-87:13, 89:13-93:5. No manager told her not to ask for them. Young Tr. 95:13-17.

10.    Many of Plaintiff's Declarants likewise admitted in their deposition that ***they were paid for bank runs***.[12]  Only three testified that they were not paid for bank runs.[13]  One other declarant, Maxine Houston, testified that her Store Manager told her that time was added when she went to the bank, but she did not believe him – but now she acknowledges that her pay records show she

---

[7] *See* Sample, Ex. 8.

[8] Young Tr. 69:8-70:1, 73:11–74:6, 74:18-75:3; Smith Tr. 108:21-25, 109:6-8; Candurra Tr. 96:10-13, 96:17-25-97:2-17; Houston Tr. at 121:17-122:16; *but see* Bland Tr. 118:2-9, 118:18-119:13; Dery Tr. 120:9-25 (denying policies were posted in some stores).

[9] *See* Smith Tr. 91:10-13; Candurra Tr. 105:18-25-106:2-7;196:11-17; Houston Tr. 92:18-93:15; Bland Tr. 101:22-102:15, 103:4-104:3; Villalobos Tr. 65:4-65:19; Donohue Tr. 60:16-20; Cook Tr.298:18-21; Campbell Tr. 83:8-84:21; Newman Tr. 77:16-18.

[10] Young Dep 65:12 – 66:22, 72:2-11, 76:8-15; Smith Tr. 94:2-22; Candurra Tr. 72:16-20, 73:4-12, 74:13-25-75:2-4, 88:5-16; Houston Tr. at 92:18-93:15; Bland Tr. 103:4-105:5, 110:20-25, 132:19-133:3; Villalobos Tr. 61:12-61:15; Donohue Tr. 66:2-5; Cook Tr. 126:3-8; Nyberg Tr. 116:19-22; Campbell Tr. 83:8-84:21; Newman Tr. 77:4-6; Dery Tr. 113:4-114:11.

[11] Young Tr. 86:7-24, 88:19-89:7; *see also* Ex. 9.

[12] Smith Tr. 51:25-52:4, 86:14-19; Bland Tr. 194:14-195:15, 258:3-9; Villalobos Tr. 117:16-117:18; Cook Tr. 148:8-24; Nyberg Tr. 71:6–25, 308:14-309:7; Campbell Tr. 22:8-24:8; 286:6-22 ; *see also* Ex. 10.

[13] Donohue Tr. 125:24-126:22, 147:16-148:8 (on days when two bank runs, first on the clock), 152:11-16 (could not recall whether used Time Clock Worksheets or requested time adjustments for bank runs); Newman Tr. 132:5-133:6; 141:9-18 (took deposits in only one store; could have submitted Time Clock Worksheet, but did not); Candurra Tr. 148:21-149:8, 156:14-157:11 (used Time Clock Worksheet, but claims wrote in time she left store, not additional time).

was paid. Houston Tr. 93:18-103:3, 107:3-110:18.[14]

11.   Dollar Tree's Declarants and the ASM survey confirm that the vast majority of ASMs are paid for all bank runs. 100% of Dollar Tree's Colorado Declarants who made bank runs were compensated for their bank run time.[15]  Only 9% of Colorado survey ASMs (18% nationwide) said they were paid for fewer than all of their bank runs, and only 2% in Colorado (9% nationwide) claimed that the unpaid time exceeded *one hour per month*. Ex. 7 (Jay Decl. Ex. B, p. 26).

12.   Differences in local bank deposit and timekeeping practices explain the ASMs' different experiences. First, at **many** stores, bank deposits are made when the store is open. The ASM has already clocked in before going to the bank, and is on the clock. Plaintiff testified that this practice was always followed at **one** of her stores, and she was always on the clock.[16]  Several other Plaintiff's Declarants' stores also followed this practice, and they too were always paid.[17] Additionally, 96% of Dollar Tree's Colorado Declarants and over 40% of Dollar Tree's Nationwide Declarants similarly always made bank deposits **after clocking in** and were paid for that time.[18]

13.   A second practice is used at **some** stores where night deposits are made after closing. The ASM clocks out, and stops at the bank on the way home. The ASM fills out a Time Clock Worksheet indicating that time is to be added to account for the deposit. A Store Manager or an ASM enters the added time into the timekeeping system the next day. Plaintiff testified that this was the practice at two of her stores.[19] Other Plaintiff's Declarants did this in their stores.[20]

---

[14] Similarly, Raymond Dery testified that he used Time Clock Worksheets, time was adjusted, and he is not aware of any bank runs where ten minutes were not added for bank runs. Dery Tr. 162:1-163:8; 165:8-166:11. John Combs too made *some* runs on the clock and acknowledged that for others, time was adjusted. Combs Tr. 123:20-124:21; 136:4-137:16.

[15] Indeed, almost every single Colorado Declarant explained that they are always on the clock during bank runs; one Declarant does not ever make bank runs and one, on a handful of occasions, has taken a deposit on her way home and made up for the time the next day. *See* Exs. 11 and 12.

[16] Young Tr. 87:14-24; *see also* Ex. 9.

[17] Villalobos Tr. 117:9-15; Campbell Tr. 22:24-23:25; Combs Tr. 66:16-67:14; see also Ex. 10.

[18] *See* Ex. 11, 14 (declarations of A. Graham, ¶ 12; C. Degraffenried, ¶ 17; S. Padilla, ¶ 7; A. Alvarez, ¶ 17; R. Pavlica, ¶ 13; G. McCoy, ¶ 15; S. Garcia, ¶ 6; T. Giron ¶ 16; C. Contreras ¶ 12; A. Chavez ¶ 15; M. Fornaris, ¶ 14; J. Stegmeier, ¶ 16; R. Kaylan, ¶ 14; C. Slack, ¶ 14; J. Rubio, ¶ 12; F. Sanchez, ¶ 12; S. Billaluna, ¶ 17; W. Tran, ¶ 15); *see also* Ex. 13.

[19] At these two stores, Plaintiff testified that 10 minutes were always added so she would be paid for that time. Young Tr. at 91:3-8; 84:1-86:13. If Plaintiff later told her manager that the bank run took more than ten minutes, additional time was
(continued...)

14.   A third practice is used at ***other stores*** where deposits are made on the way home after closing. The difference is that the ASM leaves without clocking out. The ASM writes the time when the deposit was done on a Time Clock Worksheet, and the Store Manager or an ASM enters it in the system the next day. Smith Tr. 50:14-18, 51:5-51:9, 51:25-52:4, 77:17-78:2. Time added for bank runs varies by store, depending the distance to the bank. Smith Tr. 164:2-9.

15.   At ***yet other stores***, a fourth practice is used: the ASM returns to the store to clock out after the night deposit. Cook Tr. 148:8-23.[21]  A fifth practice, at ***some*** other stores, is that an armored car comes to the store to pick up deposits, so nobody clocks out for deposits. Campbell Tr. 22:8-19; Hernandez Tr. 83:13-19; 94:3-13. ***Some*** stores make multiple deposits, and follow various combinations of the above practices.[22] ***Some*** ASMs generally are ***not*** responsible for making deposits in their stores at all, for various reasons.[23] Campbell Tr. 22:8-19.[24]

### D.   Dollar Tree's Local Meal Break Practices Vary

16.   Local meal break practices are as varied as Dollar Tree's stores, its managers and the day-to-day conditions in each store. Plaintiff and some of Plaintiff's Declarants allege that many unpaid meal breaks are interrupted with work. Smith Tr. 194:17-19; Villalobos Tr. 98:13-98:20; Dery Tr. 144:3-144:21.[25] But many ASMs say this ***never*** happened to them. In fact, 82% of Dollar Tree's

---

added. *Id.* at 85:17-86:6, 91:3-8. At one of these two stores, the practice varied over time, starting with morning deposits after clocking in and changing to night deposits with time added the following morning. Young Tr. 87:25-89:7.

[20] *See* Bland Tr. 150:9-15, 159:21-160:20,195:16-197:12; Combs Tr. 103:23-124:16, 136:4-137:16; Dery Tr. 162:1-163:8; 165:8-166:11.

[21] Although Cook adhered to this practice, another ASM in the same store clocked out before going to the bank, and had ten minutes added to her time. Cook Tr. 145:25-150:18.

[22] *See* Ex. 13, 12 (decls. of T. Leal, ¶ 14; A. Silva, ¶ 21; J. Beamer, ¶ 12; J. Sizelove, ¶ 13); *see also* Ex. 15, (SM Decls. of Z. Linares, ¶ 13;  B. Dayton, ¶ 15; R. Fundora, ¶ 16; T. Ogburn, ¶ 16; K. Mahmood, ¶ 11; S. Quintero, ¶ 14); *see also* Bland Tr. 190:1-191:14, 194:14-25 (day deposits after clocking in, but time for night deposits added by Time Clock Worksheet); Nyberg Tr. 71:6-25 (at one store, night deposit time entered manually, but deposits before clocking out another store; Donohue Tr. 126:25-127:8, 125:17-127:16, 147:10 – 148:8 (morning and afternoon deposits while clocked in; night deposits not paid).

[23] *See* Exs. 9-11, 13.

[24] A few of Plaintiff's Declarants claim that none of these practices are used at their stores, and they are not paid for bank deposit time. Newman Tr. 131:14-132:7 (bank run in morning before clocking in and in afternoon after clocking out at one store), 140:23-141:15 (bank run took 3 minutes).

[25] Dery claimed his meal breaks were interrupted by customer issues "every single day," Dery Tr. 143:12-144:21, but then later admitted that this did not happen when he worked an early morning shift. Dery Tr. 150:23-151:12.

Colorado Declarants (88% nationwide) said their meal breaks were **never** interrupted or generally uninterrupted.[26] The survey confirms that the vast majority of ASM meal breaks were compliant, with only 14% of ASMs nationwide and 18% of Colorado ASMs reporting any interrupted meal periods for which they were not paid. Ex. 7 (Jay Decl. Ex. A, p. 27; Ex. B. p. 26-27).

17.   Different conditions in each store influence the result.[27]   Even Plaintiff admits that some meal breaks were uninterrupted. Young Tr. 129:25-130:4 ("Q. . . .there were days when -- when sometimes you got your entire 30-minute break; is that correct? A. Uninterrupted, yes."). Other Plaintiff's Declarants agree.[28]

18.   One situation when meal breaks are not interrupted is when the ASMs leave the store for the entire break. 61% of Dollar Tree Colorado Declarants (68% nationwide) said that they leave the store for meal breaks.[29] **Some** Plaintiff's Declarants testified that ASMs left the store for some meal breaks. Donohue Tr. 139:12-140:14; Combs Tr. 145:15-23; Bland Tr. 162:18-165:24; Newman Tr. 66:1-67:4. On the other hand, **some** Plaintiff's Declarants said they never or rarely left the store on meal breaks. *See, e.g.,* Smith Tr. 128:9-23, 129:11-17; Candurra Tr. 172:2-8; Dery Tr. 134:2-24. Benjamin Bland testified the only time when he could not leave the store was when no other manager was in the store. Bland Tr. 166:2-20. Plaintiff testified that Company policy allowed her to leave the store so long as another manger was there, but that policy was not followed in her store and she never left for a meal break. Young Tr. 125:4-20.[30]

---

[26] *See* Exs. 17, 18.

[27] John Combs testified that *in one store* he was "rarely, if ever" interrupted during a meal period, but *in another store* he was "generally" interrupted. Combs Tr. 84:13-23, 180:16-21. Katie Newman explained that ASMs *assigned to be Freight Managers* "generally [were] able to have a meal period without interruption" because the Freight Manager "didn't run register or do the front stuff. . . . where the customers and the sort of things that just go wrong on a day-to-day basis, she didn't really deal with." Newman Tr. 64:18-65:13.

[28] *See*  Ex. 16; Bland Tr. 162:12-16; Newman Tr. 62:6-22; 115:24-116:17; Candurra Tr. 260:7-17; Donohue Tr. 139:12-140:14.

[29] *See* Exs. 17, 18.

[30] Candurra testified it was her "personal prerogative" whether to leave the store, and she could leave if she was not alone in the store. Candurra Tr. 171:15-25, 259:13-23. Cook testified that her meal breaks could not be interrupted when another ASM was in the store. Cook Tr. 176:16-21, 184:12-195:25; *see also* Campbell Tr. 161:14-18. Houston testified that "most of the time" she worked in two stores per day and took her meal break after clocking out at one store while she was on the bus commuting to the other store where she clocked in again. Houston Tr. at 137:17-138:17.

19.   Scheduling to ensure that manager coverage is available during meal breaks avoids situations where ASMs cannot leave the store as the only manager in the store.[31] Good local managers schedule like that. Bland testified that no ASM *ever* was interrupted during a meal break when *he* was in charge of the store, because he *managed the store* to make such interruptions unnecessary. Bland Tr. 183:13-184:24. Jennifer Nyberg testified that the "ability level and skill level of the store manager has an impact on whether you are taking meal periods and rest breaks." Nyberg Tr. 207:1-6. Carlos Villalobos testified that *one store manager* always "covered" for his meal break, so he was less likely to be interrupted than in a store managed by *another Store Manager* who did not cover for him. Villalobos Tr. 132:25-132:17; 141:24-142:5; *see also* Smith Tr. 173:24-174:20 (schedule determined whether another manager was in when he took a meal break). Scheduling, like good – or bad – management, is a *local* matter, depending on the specific business needs and availability of managers at each store. Bland Tr. 64:21-65:4. Jennifer Nyberg testified that *whether her Store Manager worked his full schedule* affected her ability to take uninterrupted meal breaks. Nyberg Tr. 134:12-17. John Donohue testified that *on the day shift*, "there was more than one manager on duty, so it was viable" to leave the store for meal breaks. Donohue Tr. 140:10-14; *see also* Bland Tr. 271:22-272:7 (amount of overlap in managers' schedules affects ability to take meal break). Lorelei Campbell's Store Manager or other ASMs overlapped with her schedule for three hours or more four days per week. Campbell Tr. 193:13-194:24. Shannon Cook tried to take her meal breaks late in the day, because her store was less busy and she was less likely to be interrupted. Cook Tr. 95:24-96:6. Benjamin Bland testified that "whether the lunch happened at the time when it was scheduled depended upon what was going on in that particular store at that particular time."[32] Bland Tr. 305:17-22. Carlos Villalobos

---

[31] *See* Ex. 17, 18; decl. of A. Heyward, ¶ 11; J. Panxhaj, ¶ 13 O. Cantu, ¶ 11; S. Bloise, ¶ 10; Y. Conner, ¶ 9; J. Dishmey, ¶ 13; C. Kozacko, ¶ 15; C. Bell, ¶ 11; A. Silva, ¶ 18; J. O'Brien, ¶ 35; A. McGowan, ¶ 13; K. Mascarel, ¶ 14; K. Wilson, ¶ 13-14; M. Santiago, ¶ 13; D. Heaphy, ¶  18; K. Xiong, ¶ 12; F. Sanchez, ¶ 15; M. Aguilar, ¶ 19; F. Hernandez, ¶ 15; S. Hill, ¶ 6; T. Fitzpatrick, ¶ 21; K. Hendricks, ¶¶ 12, 14; F. Smith, ¶ 18; D. Truelove, ¶ 19.

[32] In some stores, associate meal breaks are built into weekly schedules. *See* Ex. 15,T. Mack, ¶ 16; S. Hoop, ¶ 8; R. Chavez, ¶ 19; M. Flores, ¶ 19. Some store schedule to ensure coverage for ASM breaks. *Id.*, declarations of D. Thrall, ¶

(continued...)

said local factors such as "lack of personnel or the way the store was being run, how busy it was" determined whether he had to work during meal breaks. Villalobos Tr. 91:20-21.

20.   Scheduling also affected **whether ASMs worked shifts of six or more hours** so they would be entitled to a meal. For some, entire weeks went by without any six-hour shift. Young Tr. 117:9-12. Likewise, there were entire weeks when multiple managers were in the store at mealtime or when they did not work any shifts of six hours or more. Young Tr. 123:16-21. The scheduling of six hour shifts varied by store and by season. Houston Tr. at 125:18-126:5; Combs Tr. 153:24-154:13. The number of managers in the store affects ASMs' ability to leave the store for meal breaks. As mentioned above, Dollar Tree stores vary in size, and the number of ASMs in the store varies from one to six. *See supra* I.A. Where more ASMs work in the store, it is easier to schedule meal breaks when another manager is present. Candurra Tr. 38:4-20 (different scheduling and manager overlap when two versus three ASMs); Bland Tr. 43:15-44:1. But even when other managers are present, their assignments can interfere, based on purely local factors. For example, a Store Manager or ASM may be working in the Stock Room or otherwise unwilling to cover the floor during a meal break, so the ASM on a meal break is interrupted. *See, e.g.*, Houston Tr. at 165:9-166:2 (sometimes presence of another manager was effective to prevent interruptions but sometimes the other manager was busy with something else); Bland Tr. 168:14-169:21 (whether another ASM would handle a task "depended on what the manager or the other assistant was doing," or "or what their response time would be to a -- to a page"). On the other hand, Cook testified that when a customer approached her during a meal break when another manager was present, she directed the customer to the other manager. Cook Tr. 212:1-11.

21.   Managers have come up with a variety of methods for managing timekeeping and break policies. For example, some managers give out timers to help track the length of time on

---

14; T. Brooks, ¶ 7; T. Mack, ¶ 16; E. Smith, ¶ 9; C. Patterson, ¶ 13; D. Sosa, ¶ 21; A. Westfall, ¶ 14; R. Chavez, ¶ 19; M. Flores, ¶ 14. And in yet other stores, managers leave it to associates to determine when to take a meal break, but monitor them and remind them to take their breaks. *Id.*, decls. of T. Brooks, ¶ 17; S. Copeland, ¶ 17; J. Lopez, ¶ 7.

break before returning to work.[33]  In some stores, ASMs whose breaks have been interrupted take additional time off –*on the clock* – later in the day to make up for earlier break interruptions. Young Tr. 133:1-9; Candurra Tr. 253:13-25-254:2-20; Cook Tr. 88:14-89:4; *see also* Exs. 17, 18. Others did not do that. Dery Tr. 149:21-150:1. In other instances, ASMs who fail to take a break simply *never clock out* for the break, and remain on the clock (and paid) for the entire time. *See* Ex. 2.

22.  In yet other stores, *Time Clock Worksheets are used to shorten the length of the breaks* so they are paid for the time worked during the breaks. Plaintiff admitted that the "majority" of the time, an ASM or the Store Manager adjusted ASMs' time entries to make sure they got paid for the whole break. Young Tr. 136:9-137:13.[34] Plaintiff's Declarant Cook testified that every time she worked during a meal break, she used a Time Clock Worksheet to adjust her time on the clock to reflect the time worked.[35] Plaintiff's Declarant Houston had a different experience. Her Store Manager allowed her to claim additional paid time when her meal break was interrupted, so she wrote the necessary changes in Time Clock Worksheets, but she does not believe that the changes were put into the system. Houston Tr. at 117:22-118:7, 124:1-11.[36] And still other ASMs failed to use Time Clock Worksheets to ask to be paid for time worked during meal periods, even though nobody told them they could not use the Worksheets for this purpose. Bland Tr. 205:25-206:5, 235:19-23; Dery Tr. 152:4-153:7. Indeed, 100% of Dollar Tree's Colorado Declarants who experienced any interruptions during meal periods testified that they were compensated for those interruptions.[37] The type of interruption is also an important local factor. The

---

[33] *See* Decl. of T. Manley, ¶ 12; A. Chase, ¶ 9; T. Parker ¶ 14; M. Jackson, ¶ 14; O. Cantu, ¶ 8; S. Bloise, ¶ 7; Y. Conner, ¶ 8; M. Barton, ¶ 14; T. Gerloff, ¶ 20; T. Griffin, ¶ 17; B. Locke, ¶ 18.

[34] Nobody told Young not to request time edits if she worked during a meal period. Young Tr. 152:16-153:4.

[35] Cook Tr. 118:12-119:4 ("Q. If I understand you correctly, you would – if you performed work during a meal period, you would complete a Time Clock Worksheet? A. Yes. [Objection omitted] A. Only when it wasn't complete. If I couldn't clock in and I was with a customer, I'd have to use that time clock sheet so they knew that I have an error that has to be edited. Q. Did you do that each time? A. Yes."), 252:24-253:4 ("Q. Did – in each instance that you forgot to clock in or out for a break, not a meal period, did you complete a Time Clock Worksheet? A. Yes. Q. Is the same true for meal periods? A. Yes. . ."), 331:13-24.

[36] *See also* Campbell Tr. 213:12-25 (Time Clock Worksheet could be used to add time for interrupted meals); Newman Tr. 130:12-131:3 (could have used Time Clock Worksheets to add in time for meal interruptions, but did not do so).

[37] *See* Ex. 17.

duration of the interruptions varied. Houston Tr. at 177:22-25; Villalobos Tr. 108:23-109:8, 153:5-153:13; Combs Tr. 117:6-23, 164:3-12; Dery Tr. 144:15-21. Some instances are very short. For example, Katie Newman testified that "there were occasions where [she] got interrupted just for a few minutes and [she] went back to [her] lunch period." Newman Tr. 136:17-20. Benjamin Bland testified that typical interruptions included cashiers needing change, back-up help on a register or a void, or an employee sale, and that the duration of these interruptions varied but often was only a few minutes. Bland Tr. 170:4-175:14. Others, such as a balloon sale or an associate needing to use the restroom, last longer, depending on the specific needs or conditions of the store at the time. Bland Tr. 170:4-175:14; *see also* Campbell Tr. 200:2-21. Since *de minimis* interruptions do not turn a meal break into compensable work time,[38] these local factors are important.

23.   Other factors influencing the ability to take uninterrupted meal breaks include "the success of a store in terms of meeting its sales goals," and "the experience level of the associates under [the ASM's] supervision." Nyberg Tr. 159:19-160:3, 206:12-15.

24.   Given the wide range of experiences with bank deposits and meal periods, it is not surprising that putative class members' experiences with respect to off the clock work in general diverge. While Plaintiff claims she worked off the clock, 93% of Dollar Tree's Colorado Declarants say that they have been paid for all time worked.[39] *See* Ex. 19. 85% of Colorado survey respondents (86% nationwide) say that they were logged in to the time clock the entire time they

---

[38] *See e.g. Garcia v. Tyson Foods, Inc.*, 766 F. Supp. 2d 1167, 1180-82 (D. Kan. 2011) (quoting *Lamon v. City of Shawnee, Kansas*, 972 F.2d 1145, 1157 (10th Cir. 1992) (non-compensable meal period is one in which the "employee's time is not spent predominately for the benefit of the employer.").

[39] Dollar Tree also offers declarations from Store Managers who supervised ASMs throughout the country, including in Colorado. *See* Ex. 15. The overwhelming majority of SMs interviewed reported that they make sure their stores adhere to Dollar Tree's timekeeping and compensation policies. Colorado SMs report that "it has been made clear [] that the company simply will not tolerate off the clock work of any kind." *See* Walton Decl. ¶ 6; *see also* A. Clark, ¶ 8; T. Dindinger, ¶ 9; F. Espinoza, ¶ 8; P. Gutormson, ¶ 8; Z. Linares, ¶ 8; D. Thrall, ¶ 7; K. Walton, ¶ 7. One Colorado SM clarifies: "I strongly believe in this policy, and I want to make certain that my employees receive all of the money that they are entitled to. . . I think they need to get everything that they are entitled to including payment for all time worked, rest breaks, and a lunch break." *See* T. Dindinger, ¶ 7. The managers are vehement that they have never instructed or requested that an ASM perform off the clock work, have never cut back the hours that they know an associate has worked or otherwise inserted breaks on time records where they knew the associate did not take a break, and believe that their associates have been paid for all hours worked. *See* decls. of A. Clark, ¶¶ 18-19; T. Dindinger, ¶¶ 23-24; F. Espinoza, ¶¶ 19-20; P. Gutormson, ¶¶ 20-21; Z. Linares, ¶¶ 11, 17; D. Thrall, ¶¶ 19-20; K. Walton, ¶¶ 17-18.

spent performing work related tasks every day. Ex. 7 (Jay Decl. Ex. A, p. 35; Ex. B. p. 34.)

## II.   ARGUMENT

### A.   Plaintiff Cannot Demonstrate That Certification Is Appropriate

Plaintiff bears a heavy burden on certification. First, she must satisfy the rigorous Rule 23(a) standards: (1) numerosity; (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical ... of the class'); and (4) adequacy of representation ('fairly and adequately protect the interests of the class'). Fed. R. Civ. P. 23(a).[40] Second, she must also satisfy Rule 23(b)(3): common issues of fact or law must predominate over individual issues, and class action treatment must be superior to other forms of adjudication.[41] *See* Fed. R. Civ. P. 23(b); *see also Amchem Prods. v. Windsor*, 521 U.S. 591, 613-14 (1997).

The class-action device is designed to be "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979). Rule 23's procedural requirements were designed to safeguard due process rights and ensure that the class action device is employed *only* when the issues to be litigated are common across the class such that hearing evidence from representative plaintiffs is the same as hearing evidence from any other class members. *See Amchem Prods.*, 521 U.S. at 613.

The Supreme Court emphasized this year in *Wal-Mart* that the class action mechanism is inappropriate for cases alleging that local managers failed to follow a central policy that prohibits the illegal act that forms the basis of the lawsuit. In *Wal-Mart*, the company's "announced policy forb[ade] sex discrimination." 131 S. Ct. at 2553. The plaintiffs nevertheless sought to certify a class on the basis that Wal-Mart gave local managers discretion that could be used to disobey the non-discrimination policy. *Id.* The Court *expressly rejected the idea that local practices that deviate from a central policy can support a class action*, holding "that is just the opposite of a

---

[40] Throughout her brief, Plaintiff cites to FLSA conditional certification cases. *See, e.g.*, Pl.'s Mot. at 13-16. Because Plaintiff's Rule 23 Motion does not involve conditional certification, such cases and their analyses are inapposite.

[41] Plaintiff does not seek certification under Rules 23(b)(1) or (2) in her Motion.

uniform employment practice that would provide the commonality needed for a class action." *Id.* at 2554. The Court reversed certification, explaining that commonality "does not mean merely that [the putative class members] have all suffered a violation of the same provision of law." *Id.* "[T]he mere claim by employees of the same company that they have suffered [an injury] … gives no cause to believe that all their claims can productively be litigated at once." *Id.* at 2551. Instead, the "common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "What matters to class certification … is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (citation and internal quotations marks omitted; emphasis in original). The Court emphasized that ***"[d]issimilarities within the proposed class are what have the potential to impede the generation of common answers***." *Id.* at 2551 (emphasis added). The Court found differences in how local managers exercised discretion; those differences made it "impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question why was I disfavored." *Id.* at 2552. It is no wonder that Plaintiff does not even ***mention*** *Wal-Mart* in her brief.

### B.  There Are No Common Issues Under Rule 23(a) Here

#### 1.  A Case Based On Exceptions To The Rule Cannot Be Certified

Plaintiff *admits* that her case is about *exceptions* – instances where local individuals did not follow Dollar Tree's policies.

> Q. So you've testified that it was Dollar Tree's policy that associates and assistant store managers were not supposed to work off the clock. So if that ever happened, that people did work off the clock, that was an instance of the manager and/or the associate not following the company's policy?
>
> A That's true.

Young Tr. at 77:7-16; *see also id.* at 172:5-25. The key differences are the local manager and the store. As Plaintiff herself admitted, some of the local managers did better than others at complying

with the policy against off the clock work:

> Q. It was up to local managers as to whether they followed the timekeeping policies as they're reflected in the handbook, right? [Objection omitted]
>
> A. Well, they followed them to the best of their ability, but –
>
> Q. And some did better than others, right? [Objection omitted]
>
> A. Correct.

Young Tr. 230:11-20; *see also id*. 23:13-24:8. Plaintiff also admitted that timekeeping practices differed among stores. Young Tr. 228:2-4.

Even the individual ASM's preferences play a major role. Jennifer Nyberg testified that she knew she was not supposed to work during meal breaks, but she did anyway because she disagreed with the policy.[42] Likewise, John Donohue admitted that he "absolutely" enforced the no-off the clock policy during meal breaks when he was a Store Manager, and as an ASM for all his subordinates – he just did not follow it for himself as an ASM. Donohue Tr. 68:13-16, 72:23-73:14.

This case is thus just like *Wal-Mart* because it depends on proof of local individuals' failure to comply with the policy *against* the unlawful act at the heart of the lawsuit.[43] Here, local managers followed widely divergent practices with respect to the matters at the core of the case: bank deposits and meal periods. ASMs' experience with bank deposit practices ranged from "always got paid" to "never got paid" and included numerous different local practices.

- Plaintiff, most of Plaintiff's Declarants and all of Dollar Tree's Declarants were compensated for ***virtually all*** of their time spent making bank deposits. *See supra* I.C. 9-

---

[42] Nyberg Tr. 197:16-198:2 ("Q. So it's true that you knew at all times . . . you were expected to take that full 30-minute meal period if for some reason outside of your control you needed to work during a meal period? [Objection omitted] A. Yes. Q. And it's true also that you chose to violate that policy because of your belief that the policy was unproductive? [Objection omitted] A. Yes. Because . . . I had work to do.").

[43] Indeed, during a recent hearing on a motion by Plaintiff's counsel for consolidation of this action with other lawsuits seeking similar relief, the Judicial Panel on Multidistrict Litigation questioned whether Plaintiff could distinguish this case from the *Dukes* case. *See* Ex. 22. *In re Dollar Tree Stores, Inc. FLSA & Wage & Hour Litig.*, Tr. from 12/1/11 Hr'g on Mot. for Consolidation, 8:16-18 ("Is there a policy at stake here or whether there is off the clock work? It sounds like something that could be very particularized to even a store manager level."), 9:18-25 ("[Here,] the policy is to give [breaks] to them and you're saying that the practice is that they don't take it…It's a national policy like the Wal-Mart case. The national policy is it would actually be consistent with the law . . . and what the basis of the lawsuit is that the individuals aren't able to adhere to that policy by virtue of their supervisors.").

11. In contrast, some of Plaintiff's Declarants testified that they were *never* paid for time spent making bank deposits. *See id.*

- Local store practices varied widely, from ASMs who *never* took bank deposits, to others who made daytime deposits *without clocking out*, to others who clocked out before night runs but had **minutes added to their clock-out times**, to others who did not clock out when they left to make a night deposit but had a *clock-out time entered manually* for the end of the bank run. *See supra* I.C. 12-15.

- Similarly, meal period practices varied widely, depending on local factors such as the management's skill in scheduling breaks, and local store conditions.

- Some ASMs **always** got uninterrupted meal breaks, and some *never* did. Some got them at *some stores but not others*. *See supra* I.D.16-18.

- Local factors, such as how a manager *scheduled* the store and the **number of ASMs** in the stores, variously affected the ability of ASMs to leave the stores for meal breaks and to remain in the stores without interruption. *See supra* I.D.19, 20.

- Local managers followed different practices for correcting interruptions, ranging from *breaks on the clock* to *additional unpaid breaks* and *adding in paid time* for interruptions. Plaintiff says *some* were *not corrected*. *See supra* I.D. 21, 22.

Likewise, putative class members vary widely with respect to whether they would have exceeded 40 hours in a week (and been entitled to overtime), even if they had worked off the clock during meal breaks and bank runs. 54% of Dollar Tree's Colorado Declarants and almost 30% of all Dollar Tree's Declarants said they never or rarely work more than 40 hours per week.[44] Similarly, Shannon Cook testified that she never worked more than 40 hours in a week. Cook Tr. 47:3-7, 77:13-15. In contrast, at least one of Plaintiff's Declarants worked more than 40 hours per week on numerous occasions. *See* Dery. Tr. 126:19-128:5. One reason for these differences is that some putative class members are *part-time* and others are *full-time*. *See supra* I.A.3. Part-time ASMs in Colorado hours average 26-29 hours per week—*including* meal breaks.[45] Therefore,

---

[44] *See* Exs. 19, 20.

[45] *See* Ex. 2 (Baker Rpt.), ¶ 8, Table 1. In many cases, these assumptions attribute more extra hours to part-time ASMs even if one assumes arguendo that they worked off the clock at all. Testimony and local bank log records show that usually the bank runs were covered by several different ASMs, so each ASM took deposits to the bank only a few times a week rather than the five times assumed here. *See, e.g.,* Decl. of A. Chase, ¶ 18 (2x month); R. Pavlica, ¶ 13 (from time to time); T. Moreiko, ¶ 16 (1x wk); Ex. 18. Similarly, many ASMs did not work shifts in excess of six hours five time per week, *see* Dominguez Decl. ¶ 6, J. Sandoval Decl. ¶ 6, S. Padilla Decl. ¶ 6, so the assumption of five meal periods per week is also generous.

the vast majority of part-time ASMs would not reach more than 40 hours even if one assumed *arguendo* that they worked off-the-clock every bank run and meal period.[46]  A review of individual factors is required to determine who could have worked overtime.[47]

In light of these differences, it is not surprising that putative class members' experiences vary with respect to off the clock work. Indeed, the overwhelming majority of Dollar Tree's 158 declarants nationwide and 28 in Colorado say that off the clock work is prohibited in their stores. *See* Exs. 19, 20. All of this evidence shows that Plaintiff's claims are a search for "needle in the haystack" exceptions where local management did not follow the rule against off the clock work. *See* Young Tr. 77:7-16. As a result, "to determine whether people worked off the clock, what you need is local information," Candurra Tr. 179:2-25-180:2-10,  and review of "[local store] circumstances," such as the length of the cash register line and "whether . . . the store was following company policy." Candurra Tr. 182:13-183:4. To find out what happened at stores across the country, one "would have needed to be there." Candurra Tr. 186:19-25-187:2. Plaintiff and her Declarants agreed.[48]

Because Plaintiff is alleging that Dollar Tree's time records are **not accurate** (i.e., that some time worked is not recorded), *see, e.g.,* Bland Tr. 55:24-56:22, and Plaintiff and Plaintiff's Declarants testified that they cannot identify specific times when they worked off the clock,[49] a review of corporate electronic records will not suffice to determine hours worked; **local testimony** by the ASM and coworkers **is required.** Similarly, because Plaintiff and others testified they took

---

[46] Five 30-minute meal periods adds only 2.5 hours to the tally, and five bank runs would add only 75 minutes (assuming 15 minutes each). This adds up to less than 4 hours per week.

[47] Similarly, minimum wage claims would also differ among the putative class, depending on each ASM's hourly wage rate. The ASM must have worked enough hours off the clock that the total dollars paid in the week divided by the total hours worked (including alleged off the clock work) is less than the minimum wage. Some putative class members, however, had hourly wage rates that are so high that they would have had to work extraordinary off the clock hours to dip below the hourly minimum wage. For example, some ASMs are paid as much as $21.68 per hour. McDearmon Decl. ¶15. Determination of the minimum wage claim, therefore, requires an individualized, weekly assessment of the number of alleged off the clock hours and total wages.

[48] *See* Young Tr. 59:16-60:9 (no knowledge outside stores where she worked); *see also* Ex. 21.

[49] See Young Tr. 168:23-170:9; Smith Tr. 36:21-37:2, 175:6-1; Bland Tr. 55:24-56:22 .

***meal break time off while still on the clock*** in order to make up for earlier off the clock meal break time which they had to work, *see, e.g.*, Young Tr. 133:1-9; Candurra Tr. 253:13-25-254:2-20, corporate time records will not identify all of the times when ASMs actually took meal breaks. Again, local testimony by the ASM and co-workers will be required for each ASM.

For all of these reasons, the claims in this case ultimately devolve into an individualized inquiry into local and individual evidence for each putative class member for each week of his or her employment as an ASM, including:

- A review of local, handwritten deposit logs to determine how often and at what time an ASM did a bank run.

- A review of local practices (via local store manager and associate testimony) and individual time records to determine whether an ASM was clocked in for each bank runs.

- A review of local bank run timekeeping practices (via local store manager and associate testimony and local Time Clock Worksheets) to determine whether Worksheets were used to add time for each bank run, if the ASM was not already on the clock.

- A review of local schedules and testimony from local store managers and associates to determine whether and when the ASM worked over 6 hours and was entitled to a meal break, and whether another manager was in the store when the ASM took a meal break.

- A review of time records for days when an ASM was entitled to a meal break to see if the ASM clocked out for the break – and, if not, whether the ASM was paid for all time from shift start to end.

- Testimony from local store managers and associates about what happened during each meal break, including whether the ASM left the store, or if not, whether and how often the ASM was interrupted and the nature and duration of each interruption.

- Testimony from local store managers and review of local Time Clock Worksheet records to determine whether time was added for time worked during interrupted meal breaks.

- The number of hours the ASM logged each week in the timekeeping system.

- Testimony by the ASM and co-workers about the total number of hours worked by the ASM, including alleged off the clock time, to determine whether the total exceeds 40.

- The ASM's hourly rate and total hours worked, including alleged off-the clock time, to determine whether the hourly rate falls below the minimum wage rate.

Especially after *Wal-Mart*, courts routinely reject certification where such an individualized inquiry is necessary. *See Hadjavi v. CVS*, 2011 WL 3240763, at *5 (C.D. Cal. 2011) ("determination

of liability and [] damages for Plaintiffs' 'off-the-clock' performance would require [ ] seeking information from every potential class member, despite having 'clocked-out,' to determine: whether the employee did not actually take a meal period or work overtime; whether the meal break owed was nonetheless provided in accordance with California law; if employees were unable to take a break, then whether it was due to Defendants' act or on the employees' own fruition; and if determined to have worked 'off-the-clock,' then to determine the number of shifts worked."); *Rosales v. El Rancho Farms*, 2011 WL 6153276, at *20-31 (E.D. Cal. 2011) (denying certification of break claims where declarations presented "conflicting testimony" regarding implementation of company break policies, which "pose[d] a significant concern for managing a class action."*); Tracy*, 185 F.R.D. at 312 ("Absent some causal link between a common and identifiable wrongful act on the part of [defendant] and the denial of overtime in separate offices, plaintiffs cannot demonstrate the 'commonality' which is required by Rule 23."); *Hughes v. WinCo Foods*, No. CV11-00644 JAK, Jan. 4, 2012, at 8 (C.D. Cal.) (Ex. 23) (denying meal break claim; "[t]here is simply no manner in which the timing of such breaks can be proven reliably with evidence of 'a single stroke'").[50]

A particularly close analogy is *Brickey v. Dolgencorp*, 272 F.R.D. 344 (W.D.N.Y. 2011). The court declined to certify a class of ASMs of another dollar store who similarly alleged that the local store managers had incentives to require off the clock work because of policies requiring stores to stay within payroll hours allocations. *Id*. at 345. The court reasoned:

> Because the plaintiffs' claims arose in different stores, under different managers, who reacted to Dolgencorp's hours allocation policy and other policies cited by plaintiffs, to varying degrees and in different ways, the claims are too highly individualized to form the basis for a proper class action.

*Id*. at 349. The same result is appropriate here.

### 2.    Plaintiff Offers Nothing But Her Own Say-So In Colorado

Although Plaintiff (who worked in Colorado for less than 8 months) seeks to certify a class

---

[50] *See also McReynolds v. Merrill Lynch*, 2011 WL 4471028, at *3-4 (N.D. Ill. 2011) (denying certification; policies in question "depend in their implementation on discretionary decisions that affect each of the class members. . . . Each decision would have to be examined to determine whether the particular [employee] was the victim of discrimination.").

of all ASMs in Colorado,[51] she offers **no evidence** from any ASM in Colorado other than her own declaration.[52] Although Plaintiff submitted 12[53] other boilerplate declarations with her Motion,[54] **not one of those is from a Colorado ASM**. Plaintiff herself cannot offer evidence about other stores; she admitted she has no basis to know what the practices are at any store other than the ones where she worked. *See* Young Tr. 60:1-9, 166:20-167:21, 231:24-232:3.

In contrast, Dollar Tree offers declarations from 28 ASMs who *work in Colorado*. Each of them has testified that they know working off the clock is prohibited, and 92% say they believe they have been paid for all hours worked. Ex. 19. Thus, there is no evidence of any other ASM in Colorado who shares a claim similar to Plaintiff's – and lots of evidence that other ASMs do not. Plaintiff's lone declaration falls far short of the showing of common claims required by *Wal-Mart*. 131 S.Ct. at 2556 (anecdotal reports from 235 of 3400 stores failed to "demonstrate that the entire company 'operate[s] under a general policy of discrimination,' which is what [plaintiffs] must show to certify a companywide class.").[55] *See also Bennett v. Nucor Corp.*, 656 F.3d 802 (8th Cir. 2011) (no certification; plaintiff's evidence "consists primarily of the plaintiffs' own declarations" which "d[id]

---

[51] Although Plaintiff's Amended Complaint proposes nationwide classes for Count III ("Unjust Enrichment"), and Counts IV-V (under the "Colorado Wage Act"), Plaintiff's Motion for Class Certification requests *only* a class of Colorado ASMs for the period July 15, 2008 to the present. *Compare* Am. Compl. (#28) *with* Pl.'s Mot., pp. 1, 27. Plaintiff has not brought any other timely motion to certify a nationwide class for Counts III-V. *See* Order Re: Motions for Class Certification (# 4) (requiring any certification motions be brought within 30 days after Dollar Tree's first response to the Complaint). Accordingly, her nationwide class claims in Counts III-V are waived, and must be dismissed. *See also* (# 75).

[52] To the extent Plaintiff asserts that the same practices occur in all stores, that is speculation. "One [case] is an anecdote, and several cases are several anecdotes. Judges do not find [liability] on such a thin basis." *Gleason v. Mesirow Fin.*, 118 F.3d 1134, 1141 (7th Cir. 1997) (internal quotation marks omitted).

[53] Despite this Court's order to make all declarants available for deposition by December 21, 2011 (#73), counsel for Dollar Tree was notified the day before Ms. Kelly's scheduled deposition that she would not appear for deposition.

[54] The extent to which Plaintiff's Declarants' boilerplate declarations conflict with their own deposition testimony and depart from the truth is truly startling. As just one example, Plaintiff Young and many Plaintiff's Declarants assert in declarations that they were not paid for bank runs, but as set forth *supra* I.C.9-10, their deposition testimony shows that in fact they were paid for them. Dollar Tree will move separately to strike Plaintiff's canned declarations, and will describe the falsities in them in detail in that motion.

[55] Plaintiff is wrong to suggest that the court may not consider the merits of her claim in determining class certification. *See* Pl's Mot. at 12. The Supreme Court rejected that contention in *Wal-Mart*, 131 S.Ct. at 2552 & n.6. In fact, the Court is *obligated* to consider the merits of Plaintiff's claims to the extent they overlap with commonality questions. *See, e.g.*, *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n. 12 (1978); *Ellis*, 657 F.3d at 981; *Sher v. Raytheon Co.*, 419 F. App'x 887, 890 (11th Cir. 2011). Here, to establish commonality, Plaintiff must show that the decision to require all ASMs to work off the clock was made at the Corporate level and not by local managers or ASMs. *Ellis*, 657 F.3d at 983 n7.

little to advance a claim of commonality across the entire plant").

### 3.    The Policies Cited By Plaintiff Do Not Support Class Certification

As in *Wal-Mart*, the only central policy that has been shown in this case is the policy

***against*** off the clock work. Indeed, in support of her Motion for Certification, Plaintiff submitted

Dollar Tree's ASM Job Description, and Dollar Tree policies regarding scheduling, bank deposits,

meal breaks, timekeeping, and payroll. *See* Pl.'s Mot., Exs. C, E, F, T-Y. These are among the

policies that include the policy against off the clock work. *Id.* Plaintiff asserts that these policies

support certification because they show that Dollar Tree had "uniform corporate human resources

policies and timekeeping procedures . . .)." Pl.'s Mot. at 4. Plaintiff is wrong. Such a policy ***against***

violating the law cannot be the "glue" that holds a class together – the common thread must be a

uniform policy of ***violating*** the law.[56] *Wal-Mart*, 131 S. Ct. at 2551-55.

Neither Plaintiff nor any of Plaintiff's Declarants identified any written policy requiring off the

clock work.[57] Plaintiff appears to rely heavily on the argument that Dollar Tree had some sort of

unwritten (and largely unspoken)[58] policy requiring automatic deductions of a half-hour for meal

periods that were not actually taken. Bland Tr. 267:12-17. According to Bland, the local Store

Manager or an ASM ***manually*** entered such deductions into the timekeeping system when an

ASM failed to take a lunch break in a shift of over six hours in his stores.[59] *Id.* 265:8-266:19. Such

---

[56] Thus, Plaintiff's citation to this Court's decision granting collective certification in *Bass v. PJCOMM Acquisition Corp.*, No. 09-cv-01614 (Sept. 15, 2010), and to other cases in which the plaintiffs established that putative class members were "victims of a single decision, policy or plan resulting in violations of the FLSA," *see id.*, are misplaced.

[57] *See* Candurra Tr. 20:9-12 (Q. Is there any document you can identify that reflects or relates to a policy at Dollar Tree Stores requiring unpaid work? A. No."), 24:13-24: Q. . . . Have you ever seen any document from Dollar Tree Stores that requires or encourages off the clock work? [objection and colloquy omitted] A. I have never seen any documents."); *see also* Houston Tr. at 146:6-15; Villalobos Tr. 70:24-71:4, 122:23-123:5; Donohue Tr. 154:18-20; Campbell Tr. 38:4-15.

[58] Many of Plaintiff's Declarants testified that no manager ever told them to work off the clock. Houston Tr. at 146:6-15; Villalobos Tr. 70:24-71:4; 122:23-123:5; Donohue Tr. 67:7-68:5; 86:8-20; Cook Tr. 259:2-21; Nyberg Tr. 284:10-12; Campbell Tr. 326:4-7; Newman Tr. 88:19-20;159:10-12; Dery Tr. 52:24-53:4. Only a few Plaintiff's Declarants testified otherwise. *See* Bland Tr. 180:2-181:2.

[59] Bland admitted in deposition that it was only the local practice where he worked. *Id.* 318:12-19. Other Plaintiff's Declarants denied any such policy in their stores. Carlos Villalobos testified that there is no policy telling anyone to falsify the company's records to reflect someone took a meal period when in fact he or she did not. Villalobos Tr. 145:25-146:4. He testified that he modified records in this way, and continued to do so, even though his Store Manager and another ASM told him that it was not allowed. *Id.* 135:20-136:12, 136:20-137:11, 144:19-145:8. Cory Candurra clarified that in her
(continued...)

manual entries are not "automatic."[60] This allegation too is a claim of the exception to the rule.

Moreover, it is clear from empirical evidence that this was an exception. If this practice were uniform, the timekeeping system would not show any ASM with a shift of six hours or more without a meal break deduction. In fact, the timekeeping system shows 215,998 ASM days of 6 hours or more where no ASM meal break is recorded, so no pay was deducted. Ex. 2. Indeed, Plaintiff's Declarants admitted to instances where they worked through a meal break without punching out, and the manager never put in a meal break.[61] Smith Tr. 224:9-19. Although Plaintiff asserts that Store Managers have an incentive to make associates punch in and out for meals they did not take, in order to meet meal compliance or labor hours targets, the record does not support this. Store Managers have not been disciplined if their stores do not meet meal compliance or labor hours targets. Rose Tr. 113:24-115:9, 151:12-25.

In the end, as in *Wal-Mart*, Plaintiff has not demonstrated a common issue that has the ability to "produce a common answer to the crucial question"—whether Dollar Tree required all ASMs to work off the clock. *See Wal-Mart*, 131 S. Ct. at 2552. As set forth above, a determination regarding whether ASMs worked off the clock will require individualized inquiries into the circumstances of the ASM and his or her local store.

---

store, deductions were made when she handed in Time Clock Worksheets falsely stating that she took entire meal breaks – and she ***never told*** the Store Manager the time entries were not accurate. Candurra Tr. 257:2-25, 258:2-7.

[60] In the context of *manual* changes, Plaintiff's use of the term "automatic" is hyperbole. Dollar Tree's timekeeping system records only the times that are entered by associates clocking in and out or manually entered using Time Clock Worksheets. If an ASM does not clock out for a meal period or indicate a meal period on a Time Clock Worksheet, then *no* meal period will be recorded. *See* McDearmon Decl. ¶ 30. No punches are automatic. *Id.* This is different than an "automatic deduction" system. *See McClean v. Health Sys., Inc.*, 2011 WL 6153091, at *2 (W.D. Mo. Dec. 12, 2011); *see also Creely v. HCR ManorCare, Inc.*, 789 F. Supp. 2d 819, 821 (N.D. Ohio 2011) (under employer's auto-deduct system, "employees clocked in at the beginning of their shift and clocked out at the end of their shift; they did not clock in and out for their meal break"); *Lindberg v. UHS of Lakeside, LLC*, 761 F. Supp. 2d 752, 755 (W.D. Tenn. 2011) (distinguishing auto-deduct policy from new policy under which employees were required to clock in and out for their meal period); *King v. Heritage Enters., Inc.*, 2010 WL 3433292, at *3 (C.D. Ill. Aug. 25, 2010) (same).

[61] Contrary to Plaintiff's declarations, the testimony does not show that ASMs were instructed to record meal breaks they did not take or face discipline. Dollar Tree does not discipline any ASM or failure to falsely record a break not actually taken. For example, Gerald Smith testified that when he worked through a meal break without punching out, the manager never punched out for him and he was not disciplined. Smith Tr. 224:9-19. The missed break simply showed up on a break variance report, and Smith was paid for that time worked.

### C.   Plaintiff Is Not Typical of the Putative Class

The proposed class also fails Rule 23(a)(3)'s typicality requirement. "The essence of the typicality requirement is captured by the notion that as goes the claim of the named plaintiff, so go the claims of the class." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006), *accord Sprague* v. *GM Corp.*, 133 F.3d 388, 399 (6th Cir. 1998).[62] First, Plaintiff admittedly has no claim for lost wages during bank runs, because she was paid for all such time. *See supra* I.C.9. Thus, her claims are not typical of a class seeking relief for unpaid bank runs. Second, all other ASMs from Colorado who submitted a declaration (Dollar Tree's Declarants) report that they did not work off the clock. Plaintiff disagrees, but that merely shows that her claim is not typical. Such an atypical plaintiff cannot represent a class. *See, e.g., Daskalea v. Wash. Humane Soc'y*, 275 F.R.D. 346 (D.D.C. 2011) (denying certification where plaintiffs' experiences were atypical of the class).

### D.   Plaintiff Also Fails To Satisfy Rule 23(b)(3)

### 1.   Common Questions Do Not *Predominate* Under Rule 23(b)(3)

Even if Plaintiff had raised common questions (she did not), individualized issues would still preclude a finding that common questions predominate under Rule 23(b)(3). Fed. R. Civ. P. 23(b)(3); *Monreal v. Potter*, 367 F.3d 1224, 1236-37 (10th Cir. 2004). "[T]he predominance criterion is far more demanding" than the commonality requirement. *Amchem Prods.*, 521 U.S. at 623-24; *Clark v. State Farm Mut. Auto. Ins. Co.*, 245 F.R.D. 478, 488 (D. Colo. 2007) *aff'd*, 590 F.3d 1134 (10th Cir. 2009) (common issues do not predominate in claims against insurance company because determining the date of reformation of each plaintiff would be highly fact specific and individualized) (internal citations omitted). Here, individualized issues would overwhelm any common issues for all the same reasons set forth above. *See Sepulveda v. Wal-Mart Stores, Inc.*, 237 F.R.D. 229, 247-50 (C.D. Cal. 2006) (denying 23(b)(3) certification in exemption and overtime case despite the existence of some common questions because individualized issues would

---

[62] *See also Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 158 (1982)*Tracy*, 185 F.R.D. at 308, 311.

predominate, such as "the amount of overtime pay owed, [and] the number of breaks that have been missed," and would vary based on local "characteristics of the store, its workforce . . . the [manager's] experience . . . and the personal preferences of [supervising] managers"), *affirmed in relevant part by Sepulveda v. Wal-Mart Stores, Inc.*, 275 F. App'x 672 (9th Cir. 2008).[63]

### 2.   A Class Action Is Not the Superior Method For Adjudication Here

It is also Plaintiff's burden to show that trial of the case as a class action would be manageable and is the superior method for adjudication.[64] *See Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006); *Spa Universaire v. Qwest Comm.*, 2007 WL 2694918 (D. Colo. 2007) (denying certification in anti-trust case because variations in sales prevented manageabilty). Plaintiff has not met this burden. Due to the highly individualized proof required here, a mini-trial would be needed for each putative class member on both the merits and damages. Such mini-trials defeat the class action mechanism. *Pueblo of Zuni v. U.S.*, 243 F.R.D. 436, 451-52 (D.N.M. 2007) (individual issues require mini-trials and make a class action unmanageable); *Altier v. Worley, LLC*, 2011 WL 3205229, at *46-48 (E.D. La. 2011) (individualized damages show that common issues do not predominate and class action is not the superior adjudication method). A "suit could become unmanageable and little value would be gained in proceeding as a class action … if significant individual issues were to arise consistently." *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998); *accord In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121 (8th Cir. 2005).[65]

---

[63] *See also Aburto v. Verizon California, Inc.*, No. CV-11-03683, 2012 U.S. Dist. LEXIS 329, at *13-19 (C.D. Cal. 2012) (denying class certification in overtime and misclassification case where plaintiff failed to establish the case could "be resolved by answers common to the class": *even if* the defendant had centralized policies regarding manager job duties and responsibilities, whether individual managers were misclassified "is an individualized inquiry involving facts unique to each potential plaintiff," and "knowing how one Local Manager performed his/her job duties does not enable us to predict how any other Local Manager performed his/her job").

[64] Plaintiff has not shown that individual prosecution would be unmanageable. Plaintiff inaccurately states that she is "unaware of any individual who is interested in 'controlling the prosecution of…separate actions' or of any other pending overtime lawsuits against Defendant by putative class members." *See* Pl.'s Mot. at 23. To the contrary, Plaintiff's counsel sought MDL consolidation of multiple cases filed by other individual plaintiffs seeking similar relief.

[65] While Plaintiff may advocate a trial by formula, e.g., for damages, the *Wal-Mart* Court rejected this approach. *Wal-Mart*, 131 S. Ct. at 2561 ("The Court of Appeals believed that it was possible to replace [individualized] proceedings with Trial by Formula. . . . We disapprove that novel project."). *Compare Wal-Mart*, 131 S. Ct. at 2561 *with* Pl.'s Mot. at 25. *See*

(continued...)

### E.   Plaintiff Is Not an Adequate Class Representative, and Conflicts Divide the Putative Class

The Rule 23(a)(4) requirement of adequate representation "raises concerns about… conflicts of interest." *Falcon*, 457 U.S. at 157, n.13 (1982). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir.1998)).

Here, irremediable conflicts between Plaintiff and the putative class, and among putative class members, prevent certification. Based on Plaintiff's own testimony, Plaintiff and ASMs perpetrated the alleged violation. Plaintiff testified that ASMs call each other out to work during meal breaks without pay. Young Tr. 146:20-25. Other Plaintiff's Declarants admitted that they called ASMs out to work during breaks.[66] Some also admitted that they personally instructed or caused other ASMs to work off the clock by putting in for meal breaks they never took.[67]

Additionally, Plaintiff and other ASMs were responsible for overseeing and enforcing Dollar Tree's timekeeping and wage and hour policies. Young Tr. 71:11-23.[68] Plaintiff admitted that

---

*also Broussard* v. *Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 342 (4th Cir. 1998) ("[W]hen the defendant's affirmative defenses may depend on facts peculiar to each plaintiff's case, class certification is erroneous.").

[66] Smith Tr. 130:14-132:4 ("Q. So it was cashiers and assistant store managers who would interrupt you during your meal break? [Objection omitted] A. Yes. Q. And did you ever yourself call out any of the other assistant store managers to do some work during one of their meal breaks? A. Yes."), 147:22—148:5, 149:19—150:19; C. Candurra Tr. 80:9-20 ("Q. . . . if an assistant store manager is – is on a lunch break – A. Right. Q. – and they walk – walk through the front door, other assistant store managers could and did call them to work on the register or do other work? A. Yes. [Objection omitted]. Q. And that was something that you personally did? A. Yes."), 83:25-84:2-5, 86:10-14; Bland Tr. 183:6-12 ("Q. If there was another assist – assistant manager in the store, did they sometimes call you up – [Objection omitted] – during the meal break? A. Sometimes, yes."); Campbell Tr. 198:17-199:3 ("Q.   . . .who came to call you back to the store when another manager was in the store? A. It varied. . . . it was one of the other assistants or it was Tim. . ."); Bland Tr. 183:6-18 (other ASMs; not Bland).

[67] ("Q. So is it your testimony that for other associates, you had them put in a time clock worksheet to put a lunch in that they never took? A. Yes. Q.  And did you do that for assistant store managers? A. Yes." ) Bland Tr. 265:18-24. *See also* Villalobos Tr. 121:5-121:12, 140:6-140:11; Cook Tr. 124:9-21; *see also* Nyberg Tr. 179:22 - 180:2 ("Q. Is it correct that the assistant managers at store 3894 knowingly approved time entries that indicated that you had an unpaid meal period for 30 minutes when in fact you had actually worked during that 30-minute meal period? A. Yes.").

[68] ("Q. And you were aware that you were responsible for the policies--implementing the policies set forth in [Objection omitted] Q. – Exhibit 8, correct? A. Correct."); *see also* Candurra Tr. 115:9-20 ("Q. As an assistant store manager, was it your responsibility to make sure that the associates who worked in the store complied with Dollar Tree policy? Objection (continued...)

ASMs were responsible for ensuring that associates were paid properly for bank runs.[69] She also admitted that ASMs were generally responsible for adjusting other ASMs' time. Young Tr. 139:1-11.[70] Despite this responsibility, Young failed to adjust other ASM and associates' time entries even when she knew that they had worked additional hours not recorded by Dollar Tree's timekeeping system. Young Tr. 208:7-22. Thus, in order to obtain recovery for those class members, Plaintiff would have to show that she and potentially other ASMs violated Dollar Tree policy—and the law.

It is well-settled that a class cannot be certified where members of the putative class or the named plaintiff include supervisory personnel who implemented the allegedly unlawful practice. *See Donaldson v. Microsoft*, 205 F.R.D. 558, 568 (W.D. Wa. 2001) (certification denied because of conflicts in the class, which included individuals responsible for committing the alleged discrimination); *see also King v. Enter. Rent-A-Car Co.*, 231 F.R.D. 255, 265 (E.D. Mich. 2004) (denying certification because class members did supervisory tasks that were the subject of the claim, and "class members are potential witnesses against other class members"). Furthermore, not only does Plaintiff act under a conflict of interest with putative class members, but she testified that she was unaware that as a representative of the class she bore any responsibility whatsoever to class members, other than to testify truthfully in deposition. Young Tr. 151:15–152:9. Accordingly, Plaintiff would not be an adequate class representative and certification should be denied.

### F.   Plaintiff Lacks Standing To Represent ASMs For Bank Run Claims

"[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Wal-Mart*, 131 S.Ct. at 2550 (quoting *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S. Ct. 1891, 52 L. Ed. 2d 453 (1977).

---

and colloquy omitted] Q. All of them. A. All of them? Q. Right. A. That was part of my job."); Bland Tr. 82:9-15; 115:24-116:5; Campbell Tr. 14:2-15:3, 333:12-21.

[69] Young Tr. 82:1-14 ("Q. It says, Verify that associates have been paid for going to the bank and during bag checks. Do you see that?  A.  Yes. Q. And you understood that that was one of the responsibilities of the assistant store managers at Dollar Tree, correct? A. Correct."); *see also* Young Tr. 249:12-14; 76:9-77:4, 77:17-78:2.

[70] *See also* Smith Tr. 77:11-78:2; Candurra Tr. 152:5-12; Bland Tr. 152:14-153:3, 188:7-17; Cook Tr. 117:13-118:11; Nyberg Tr. 180:17-21. *But see* Villalobos Tr. 93:5-94:1.

Rule 23 "'effectively 'limit[s] the class claims to those fairly encompassed by the named plaintiff's claims.'" *Id.* (internal quotations omitted). Plaintiff cannot rely on the alleged injuries of putative class members to seek redress, on a class basis, for an injury she did not suffer. *Payton v. Cnty. of Kane*, 308 F.3d 673, 682 (7th Cir. 2002) "[A] class action allegation adds nothing to the standing inquiry since the named plaintiffs must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class." *Carver v. N.Y.*, 621 F.3d 221, n.6 (2d Cir. 2010) (internal citations omitted). Here, Plaintiff did not work off the clock when making bank deposits. Accordingly, she cannot represent a class on that claim.

## III.   <u>CONCLUSION</u>

Plaintiff has utterly failed to satisfy her burden to demonstrate class certification is proper. Just the opposite, the evidence shows that Dollar Tree's policies were compliant, and that an action searching for violations will require individualized trials of the particular circumstances of the ASM and the local store. For this reason and the reasons set forth fully above, Plaintiff's Motion for Class Certification should be denied.

Dated: January 6, 2012

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
Steven W. Moore, Esq.
Stacy D. Mueller, Esq.
1700 Lincoln Street, Suite 4650
Denver, Colorado 80203
Telephone: 303.764.6800
Facsimile:  303.831.9246
steven.moore@ogletreedeakins.com
stacy.mueller@ogletreedeakins.com

  /s/ Kenneth M. Willner

PAUL HASTINGS LLP
Barbara Berish Brown, Esq.
Kenneth M. Willner, Esq.
Carson H. Sullivan, Esq.
875 15th Street, N.W.
Washington, D.C. 20005
Telephone: 202.551.1700
Facsimile:  202.551.1705
barbarabrown@paulhastings.com
kenwillner@paulhastings.com
carsonsullivan@paulhastings.com
Attorneys for Dollar Tree Stores, Inc.

## CERTIFICATE OF SERVICE

I, Kenneth M. Willner, an attorney, hereby certify that on January 6, 2012, I caused a true and complete copy of the foregoing Defendant Dollar Tree Stores, Inc.'s Opposition to Plaintiff's Motion for Class Certification to be electronically filed and served via this Court's electronic filing service to counsel for Plaintiff as follows:

**Carlos V. Leach**
Morgan & Morgan, P.A.-Orlando
P.O. Box 4979
20 North Orange Avenue
14th Floor
Orlando, FL 32802-4979
407-420-1414
Fax: 407-420-5956
Email: cleach@forthepeople.com

**Andrew Ross Frisch**
Morgan & Morgan, P.A.-Davie
6824 Griffin Road
Davie, FL 33314-4341
954-318-0268
Fax: 954-333-3515
Email: afrisch@forthepeople.com

   /s/ Kenneth M. Willner
     KENNETH M. WILLNER